******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMIE MELENDEZ *v.* JOHN DELEO
(AC 36810)

DiPentima, C. J., and Lavine and Alvord, Js.

*Argued April 14—officially released August 25, 2015*

(Appeal from Superior Court, judicial district of
Waterbury, Zemetis, J.)

*Amita Patel Rossetti*, with whom was *Jeffrey J. Tinley*, for the appellant (plaintiff).

*Francis E. Genovese*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, Jamie Melendez, appeals from the judgment of the trial court, rendered after a jury verdict against the defendant, John Deleo, denying her motion for additur and/or to set aside the verdict. On appeal, the plaintiff claims that the court abused its discretion by denying her motion. We affirm the judgment of the court.

The court set forth the following factual and procedural history of the case in its memorandum of decision on the motion for additur. "The case arises out of a two car collision that occurred on April 19, 2012 . . . in Waterbury . . . . The parties were operating their respective cars. Based on the photographic, documentary and testimonial evidence, a moderate collision between the front end of the defendant's car and the driver's side of the plaintiff's car occurred.

"The responsibility for the collision was sharply contested. The jury found the defendant 60 [percent] responsible for the collision, but also found the plaintiff 40 [percent] comparatively negligent. . . .

"The jury awarded 100 [percent] of past claimed medical bills, past claimed wages and automobile property damage claims.

"The jury awarded nothing for future medical, though a substantial amount was claimed in closing argument based on the plaintiff's chiropractic expert's report.

"The jury awarded nothing for pain, suffering, impairment or the other elements and categories of noneconomic damages described at length, without exception, in the court's charge." (Footnotes omitted.)

Upon receipt of the verdict, but prior to its acceptance and recording, the court, pursuant to General Statutes § 52-223,[1] asked counsel whether he "sought reconsideration of the verdict by the jury based on the lack of an award of noneconomic damages. Counsel asked [the court] *not* to return the jury for further consideration." (Emphasis in original; footnote omitted.)

Thereafter, the plaintiff filed a timely motion for additur and/or to set aside the verdict. On April 21, 2014, the court issued a written memorandum denying the plaintiff's motion and rendered judgment accordingly. This appeal followed. Additional facts will be set forth as necessary.

We begin by setting forth the standard of review. "The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness. . . . In reviewing the action of the trial court in denying [a motion for additur and] . . . to set aside [a] verdict, our primary concern is to determine whether the court abused its discretion and we decide only whether, on

the evidence presented, the jury could fairly reach the verdict [it] did.

"In passing on a motion to set aside a jury verdict, a trial court, like a juror considering the evidence, must draw upon its experience and knowledge of human nature, events and motives and evaluate the verdict in that context. . . . If the trial judge finds the verdict to be so clearly against the weight of the evidence in the case as to indicate that the jury did not correctly apply the law to the facts in evidence in the case, or [was] governed by ignorance, prejudice, corruption or partiality, then it is his duty to set aside that verdict and to grant a new trial. . . . The trial judge has a broad legal discretion and his action will not be disturbed unless there is a clear abuse." (Citation omitted; internal quotation marks omitted.) *Fileccia* v. *Nationwide Property & Casualty Ins. Co.*, 92 Conn. App. 481, 486, 886 A.2d 461 (2005), cert. denied, 277 Conn. 907, 894 A.2d 987 (2006).

On appeal, the plaintiff claims that by declining to award any noneconomic damages while awarding all of the economic damages, the jury had "made a mistake as a matter of law." This claim is without merit.

It is well established that in Connecticut a jury's decision to award economic damages does not trigger, as a matter of law, an automatic award of noneconomic damages. "Our Supreme Court has articulated a special standard for the review of verdicts like the one at issue here to determine whether inconsistency renders them legally inadequate. . . . In *Wichers* v. *Hatch*, 252 Conn. 174, 188, 745 A.2d 789 (2000), [the Supreme Court] held that trial courts, when confronted with jury verdicts awarding economic damages and zero noneconomic damages, must determine on a case-by-case basis whether a verdict is adequate as a matter of law." (Citation omitted; internal quotation marks omitted.) *Fileccia* v. *Nationwide Property & Casualty Ins. Co.*, supra, 92 Conn. App. 486–87.

Under *Wichers*, "[r]ather than decide that an award of only economic damages is inadequate as a matter of law, the jury's decision to award economic damages and zero noneconomic damages is best tested in light of the circumstances of the particular case before it. Accordingly, the trial court should examine the evidence to decide whether the jury reasonably could have found that the plaintiff had failed in his proof of the issue. That decision should be made, not on the assumption that the jury made a mistake, but, rather, on the supposition that the jury did exactly what it intended to do." *Wichers* v. *Hatch*, supra, 252 Conn. 188–89.

Thus, pursuant to *Wichers* and its progeny, the plaintiff was not entitled to an award of noneconomic damages simply because the jury awarded her economic damages. On the contrary, the plaintiff, as the party claiming noneconomic damages, had the burden of

proving them "with reasonable certainty." *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, 218 Conn. 474, 476–77, 590 A.2d 431 (1991). Simply stated, because the plaintiff claimed noneconomic damages as defined in General Statutes § 52-572h, she had the burden of proof to show that she experienced pain as the result of the accident.[2] Having reviewed the record before us, we conclude that the court did not abuse its discretion in finding that the plaintiff had failed to meet her burden of proof.

The following additional facts are relevant to our resolution of the plaintiff's claim. At trial, the plaintiff testified that, as a result of the impact, her "body jerked around," and she hit her left hip. The responding ambulance report notes that the plaintiff's automobile appeared to have been "struck on [the] driver's side [with] moderate damage, no intrusion, all glass intact, no airbag deployment [and the plaintiff] restrained." The report further notes that the plaintiff denied losing consciousness, denied hitting her head or experiencing dizziness, and denied experiencing head, neck, chest, abdominal or extremity pain. Furthermore, the report notes that there were "no obvious injuries, deformities, or bleeding noted." The report does state, however, that the plaintiff complained of "left side lower back pain 8 out of 10." Following the arrival of the ambulance, the plaintiff was placed on a stretcher and taken to St. Mary's Hospital.

At the hospital, the plaintiff complained of "some mild neck pain and left hip pain . . . ." The emergency department physician's record notes that she appeared "alert" and "oriented," her gait was "steady," and her "[v]ital signs [were] stable. Physical exam [was] unremarkable. . . . The [plaintiff] appeared well and did not appear to have any acute injury that warranted intervention at [that] time. She *declined pain medicine*." (Emphasis added.) The record further notes that the plaintiff was discharged after she had been "counseled to follow up with her primary doctor as needed and return to the [emergency room] for any worsening severe pain, vomiting or any other concerns."

Following her discharge, the plaintiff went to her mother's house where, according to her testimony, in addition to her hip pain, she developed pain in her wrist, a headache, and became nauseous, causing her to vomit twice. The plaintiff testified that she became concerned by these developments and decided to go back to the emergency room. This time, however, she visited the Waterbury Hospital emergency room instead of returning to St. Mary's Hospital where she had been treated just hours before. When asked why she decided to go to a different hospital, the plaintiff testified that she did not "feel like [the personnel at St. Mary's Hospital] even bothered to really check me when I was there the first time."

Upon admission, the plaintiff complained of left hip pain, left wrist pain, left shoulder pain, left leg pain, and a "generalized throbbing headache." The X rays of the plaintiff's left hip, however, came back as "normal," and her pelvis images showed "[n]o fracture." Likewise, a CT scan of the plaintiff's head showed "no evidence of mass effect, mass lesion, intracranial hemorrhage or acute cortical infarct." She was prescribed an anti-nausea medication and discharged.[3]

On April 24, 2012—five days after the accident—the plaintiff went to the Children's and Family Health Center (center), her primary care provider, complaining of pain in her hip, lower back, neck, and shoulder, as well as difficulty sleeping.[4] In addition, the plaintiff complained that her shoulder and hip were popping. The center's report notes, however, that the plaintiff was "able to walk without weakness or numbness." In addition, the physical examination revealed that she had a full range of motion in her back, left shoulder, and left hip with "no crepitus noted."[5] At the conclusion of her visit, the plaintiff was instructed "to return earlier than the next regularly scheduled appointment if not improving."

On April 30, 2012, instead of returning to her primary care provider, the plaintiff began chiropractic treatment with Robert J. Costanzo. Costanzo's initial report includes a long list of new and expanded "chief complaints," including low back, left buttock and hip pain "described as moderate to sharp and constant"; "[d]aily, intermittent left leg pain, numbness and weakness that extends into the foot"; "[n]eck pain and stiffness that radiates into the trapezius musculature with more emphasis on the left described as moderate to sharp and constant"; "[d]iffuse headaches described as dull to sharp and constant with intermittent dizziness and blurred vision"; and "[l]eft shoulder pain described as mild to moderate to sharp and constant."

Following the initial physical examination of the plaintiff, Costanzo placed her on a treatment plan consisting of "cervical manipulation and flexion/distraction to the lumbar spine" and "electrical muscle stimulation and cold packs to the involved areas."[6] The plaintiff continued her treatment with Costanzo until November 19, 2012. In his final report, Costanzo determined that the plaintiff's "further treatment would be palliative," and that she will require six to nine visits "per year, more or less, due to flare-ups." In addition, Costanzo assigned the plaintiff with a 6 percent "impairment of the lumbar spine."

At trial, approximately sixteen months after her last visit with Costanzo, the plaintiff testified that her conditions had not improved. On cross-examination, however, she admitted that, following her last visit with Costanzo, she had not sought help from any medical

professional in connection with the pain stemming from the accident. Furthermore, the plaintiff testified that, while prior to the accident she had worked an average of fifteen to twenty hours a week as a home health aide, following her return to work in May, 2012, she had increased her weekly average by five hours.

Having reviewed the record, we agree with the court's conclusion that "this case involves a claim for injuries inconsistently documented and treatment based largely on the subjective and inconsistent complaints of the plaintiff."[7] As the trial court found: "[t]he plaintiff's testimony concerning current, chronic and disabling complaints of pain in the head, neck, back, hips and legs . . . [which she] claimed to have . . . sustained in the subject collision, but [the] lack of any follow-up medical treatment since fall of 2012 for these claimed disabling complaints . . . contrasted with the increased number of hours worked as a home health aide following the collision, and the apparent inconsistency of complaints in the medical reports were available for the jury's consideration." Furthermore, we note that these inconsistencies vigorously were disputed by the parties at trial, and, thus, it was up to the jury to resolve them. See *State* v. *Fleming*, 111 Conn. App. 337, 345, 958 A.2d 1271 (2008) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve" [internal quotation marks omitted]), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009); *Hughes* v. *Lamay*, 89 Conn. App. 378, 384, 873 A.2d 1055, ("[t]he existence of conflicting evidence . . . curtails the authority of the court to overturn the verdict because the jury is entrusted with deciding which evidence is more credible and what effect it is to be given" [internal quotation marks omitted]), cert. denied, 275 Conn. 922, 883 A.2d 1244 (2005).

It is axiomatic that the jury, as the final arbiter of credibility, was not required to believe the subjective complaints and testimony of the plaintiff and could, instead, have credited the medical records compiled near or at the time of the accident, which lacked objective findings of traumatic injuries associated with pain and suffering. *State* v. *Fleming*, supra, 111 Conn. App. 345 ("the jury is the final arbiter as to the credibility of any witness"). Similarly, the jury was not required to believe Costanzo. Indeed, the decision of the jury not to award the plaintiff any future medical expenses despite the 6 percent impairment rating assigned by Costanzo supports an inference that it did not consider his findings and recommendations credible. Accordingly, because we conclude that the jury's verdict in this case fell somewhere within the necessarily uncertain limits of fair and reasonable compensation, we find that the court did not abuse its discretion in denying the plaintiff's motion for additur and/or to set aside the verdict. See *Medes* v. *Geico Corp.*, 97 Conn. App. 630, 639, 905 A.2d 1249, cert. denied, 280 Conn. 940, 912 A.2d 476 (2006).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 52-223 provides: "The court may, if it judges the jury has mistaken the evidence in the action and has brought in a verdict contrary to the evidence, or has brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for the same reason may return them to a third consideration. The jury shall not be returned for further consideration after a third consideration."

In his brief, the defendant argues that by declining the court's offer to send the jury back for reconsideration the plaintiff failed properly to preserve her claim. The plaintiff, however, in bringing this appeal, did not file the entire trial transcript, but only the excerpt containing her own testimony. The defendant filed no additional transcripts pursuant to Practice Book § 63-8. Thus, that portion of the trial transcript pertaining to the defendant's claim of lack of preservation is not before us. Accordingly, the record is inadequate for a review of this claim.

[2] General Statutes § 52-572h defines noneconomic damages claimed in negligence actions as "compensation determined by the trier of fact for all nonpecuniary losses including, but not limited to, physical pain and suffering and mental and emotional suffering . . . ."

[3] At trial, the plaintiff testified that, following her discharge, she did not have any further episodes of nausea or vomiting. The plaintiff further testified, however, that, approximately a week after the accident, she developed blurry vision in her left eye. When asked to describe the degree of blurriness, the plaintiff testified that the eye would get blurry "[a] little bit. It wasn't really bad."

[4] The center's report does not mention the plaintiff's headaches. When asked at trial to explain why she had not informed her primary care provider about them during her visit, the plaintiff testified that she "would have a headache once in a while, but it wasn't all the time, every single day, you know, to say, yeah, for the first two, three weeks, month, every day I had this headache. I probably went to the doctor and that wasn't bothering me at the time if it's not in the report."

[5] Crepitation is defined as "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together . . . ." Stedman's Medical Dictionary (28th Ed. 2006) p. 457.

[6] Costanzo also directed the plaintiff to undergo additional imaging of her lumbar area. The corresponding radiological report notes that the examined area showed "no obvious evidence of recent fracture," and that the "visualized soft tissues [were] unremarkable."

[7] In her brief, the plaintiff cites to several cases, arguing that they support her claim on appeal. Having reviewed these cases, we conclude that they are distinguishable and, therefore, inapposite to the case at hand. In *Schroeder* v. *Triangulum Associates*, 259 Conn. 325, 333, 789 A.2d 459 (2002), our Supreme Court held that, because the plaintiff "underwent invasive spinal surgery," the jury reasonably could not have found that the defendant was liable for the cost of the surgery but not the pain associated with it.

In *Fileccia* v. *Nationwide Property & Casualty Ins. Co.*, supra, 92 Conn. App. 490 n.6, the plaintiff presented a CT scan of his lower back that objectively showed a "ruptured or herniated L4-L5 disc" as the result of the accident.

Similarly in *Snell* v. *Beamon*, 82 Conn. App. 141, 842 A.2d 1167 (2004), this court upheld a grant of an additur because "the court concluded that the plaintiff had presented sufficient testimony that as a result of the accident, she suffered significant physical pain, emotional distress and mental anguish"; id., 144; and that conclusion was "within the court's discretion to evaluate the evidence presented as to the plaintiff's mental and physical anguish . . . ." Id., 147.

As to our decisions to uphold the grant of an additur in *Lombardi* v. *Cobb*, 99 Conn. App. 705, 709–10, 915 A.2d 911 (2007), and *Elliott* v. *Larson*, 81 Conn. App. 468, 477, 840 A.2d 59 (2004), the decisions do not provide sufficient factual details for us to determine whether these cases support or undermine the plaintiff's claim.

———————————————